A91A0906. MANOUS v. THE STATE.
(407 SE2d 779)

BIRDSONG, Presiding Judge.

Laurance M. Manous was convicted of theft by taking, in that, "being in lawful possession of $1,123,900 in money, a value exceeding $500 and the property of Eugenia Jenkins, [he] did unlawfully appropriate said property with intention of depriving said owner of said property." He appeals. *Held*:

1. Laurance Manous contends the evidence is insufficient to support the verdict. Manous met the victim (who was 80 years old at the time of trial) and her elderly sisters when they all lived in a high rise apartment building. The elderly sisters were wealthy; their family had owned property and they possessed large amounts of stock in their brothers' chain of supermarkets. Manous, who is a pianist and singer, greatly impressed the sisters, who first heard him play when he had left his apartment door open and invited them in to listen. He gave concerts for the ladies, including one in honor of the victim Miss Eugenia Jenkins at the Ritz-Carlton Hotel, and he escorted them shopping and to dinner at restaurants such as Mary Macs and the Varsity. Over 13 years Manous befriended the victim, ultimately orchestrating the migration of himself and Miss Jenkins and her sisters and another elderly lady to neighboring apartments in another building in 1983. Manous thereafter gained Miss Eugenia Jenkins' complete devotion and dependence and acquired complete control of her affairs. The evidence shows Miss Jenkins' mental state began to deteriorate seriously in about 1984. Manous moved out of the building not very long after he moved in, which evidently caused Miss Jenkins distress and embarrassment. He bought a house in Alpharetta for $159,000 and a 1986 Lincoln; to obtain a $50,000 equity loan he listed as his assets the house unencumbered (appraised at $205,000 in 1989), and more than $200,000 in personal property, including $55,000 in musical instruments. By 1986 Manous had become co-signatory for Miss Jenkins' banking affairs. Between September 1986 and June 1987 Miss

Jenkins signed checks made out to Larry Manous in the amounts of $500,000, $50,000, and $20,000; she signed a check for a certificate of deposit purchase for $150,000; and Larry Manous signed checks on her account: a check for $50,000 for purchase of a certificate of deposit, and three checks for "Prudential stock purchase" in the amounts of $45,000, $50,000, and $46,000. In August 1986, a typed letter signed by Miss Jenkins was apparently sent to her brother, praising Manous effusively and stating a desire that he be compensated for sacrificing his own goals and marvelous career opportunity in order to give her his unselfish and loving care and to attend to her personal and business needs; to this end, the letter requested that Manous receive Miss Jenkins' stock after her death. Shortly thereafter, Miss Jenkins' brother sold Miss Jenkins' stock, yielding approximately $700,000 for her.

Miss Jenkins' niece, who had been caring for several elderly aunts and her own mother in addition to her own husband, their four children and her business, had been reluctant to interfere in her Aunt Eugenia's friendships as she would not wish her children to do that to her, and she believed Manous had been taking care of her Aunt Eugenia. However, the niece became concerned about Miss Jenkins' state of mind when, at the funeral of one of Miss Jenkins' sisters, Miss Jenkins asked whose funeral this was. The niece became more concerned when she discovered Miss Jenkins was not being cared for as she had believed; while Miss Jenkins' sisters, under the care of her niece, had round-the-clock nursing care or attendants, in Manous' care Miss Jenkins would apparently be left alone for entire days without proper food or personal care, and even with trash accumulated and many light bulbs burned out in her apartment; she had no social life to speak of and was left alone at Christmas.

On investigation, the niece discovered that Miss Jenkins had $3.90 in her bank account; all her certificates of deposit were gone and all her stock had been cashed in.

Appellant Larry Manous contends the verdict is not supported because Miss Jenkins stated at trial that she wanted him to have "as much money as he wanted for whatever he wanted it for because he was 'deserving,'"; and because he did take care of her and paid all of her bills. At trial, Miss Jenkins could not remember where she presently lived and appeared often confused. While expressing her devotion to Manous and her desire to give him what he needed, Miss Jenkins stated the following when she was shown the check for $500,000 made out to Larry Manous and signed by her: "$500.000. My word. That was in '86. . . . This check in my hand now, I don't remember any what a big sum like that. . . . Now, to frankly tell you the truth, I do not remember [whether I meant to give Larry $500,000]. I let Larry handle my business, and I did not think about it. I did not

worry about it. I didn't care what he did with the money. He looked after my interest and I depended on him. I had nobody else to depend on. I am the youngest girl in my family, and I am old now, and Larry was just so kind to me. I wanted him to know how much I appreciated it. And like I said, we were just so close for a long time. And I don't remember all this kind of rigmarole. . . . I guess that is a lot of money, but like I said, I didn't worry about money. . . . I wanted Larry to enjoy the money, and I was enjoying the money. . . . He didn't need to keep [some of that money to provide for me.] See, I have got my pension and my Social Security. So I think I will get along." She testified she did not know she had had such large sums of money as was shown to her at trial. As to whether she intended to give Larry all her money, Miss Jenkins said, "Well, no, I didn't. I haven't given him all of my money, have I? Haven't I got something? . . ."

The credibility of witnesses and weight of evidence are purely jury questions. When the jury has rendered a guilty verdict, the defendant's presumption of innocence no longer obtains; on appeal, we do not weigh the evidence or determine credibility of the witnesses, but only determine whether the evidence supports that verdict. Construing all the evidence in favor of the jury's verdict upon the evidence in this case, we find the evidence amply supports the verdict of guilty to the offense of theft by taking in this case. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560); see *Ingram v. State*, 192 Ga. App. 196, 198 (384 SE2d 262).

2. In two enumerations, appellant contends the trial court erred in denying a continuance for the State's failure to provide to appellant a timely list of witnesses pursuant to OCGA § 17-7-110 and to comply timely with his *Brady* motion. However, except to contend generally that he could have prepared his defense differently if these errors had not occurred, appellant fails to suggest any manner in which he was harmed. The burden is on the party asserting error to prove not only error but harm; " ' "[t]his court is not an expounder of theoretical law, but it administers practical law, and corrects only such errors as have practically wronged the complaining party." ' " *Dill v. State*, 222 Ga. 793, 794 (152 SE2d 741); see *Whitehead v. Cogar*, 180 Ga. App. 812, 813 (350 SE2d 821).

3. Appellant contends the trial court erred in letting in evidence of a letter Manous wrote to a spiritual advisor/psychic, inasmuch as his communication to this spiritual advisor was a privileged communication under OCGA § 24-9-22. This Code section makes privileged any communication "made by any person professing religious faith, seeking spiritual comfort, or seeking counseling to any Protestant minister of the Gospel, any priest of the Roman Catholic faith, any priest of the Greek Orthodox Catholic faith, any Jewish rabbi, or to

any Christian or Jewish minister, by whatever name called." We do not find the "spiritual advisor" or "psychic" to be included in these terms, under the evidence in this case. We find no error on this account. In any event, the trial court later instructed the jury to disregard any reference made to this letter.

*Judgment affirmed. Pope and Cooper, JJ., concur.*

DECIDED JULY 2, 1991.

*Dennis R. Scheib*, for appellant.

*Lewis R. Slaton, District Attorney, Joseph J. Drolet, Carl P. Greenberg, Grover W. Hudgins, Assistant District Attorneys*, for appellee.